ROBINSON & CO. ET AL. *v.* UNITED STATES (No. 2733) [1]

1. UNCLAIMED GOODS—CONSTRUCTION AIDED BY HEADING.

Sugar bags, covered by a through bill of lading from India to Cuba by way of New York were held in New York under special general order permit in bonded warehouse at importers' expense, awaiting more favorable market conditions in Cuba. More than a year later, importers offered an export entry, but the collector refused it, holding the goods to be unclaimed and abandoned

---

[1] T. D. 41705.

under section 491, Tariff Act of 1922. As a rule, the heading of a tariff provision is taken as indicative of the meaning, nothing to the contrary appearing. The heading of this provision is "Unclaimed Goods," and there is nothing to indicate that the section was intended to apply to goods having a known owner, paying expenses. The export entry was illegally refused.

2. PROTEST.

A protest is aimed against the action of the collector, and not against the Secretary of the Treasury's direction to him to take such action.

### United States Court of Customs Appeals, May 29, 1926

APPEAL from Board of United States General Appraisers, G. A. 9083, T. D. 41305

[Reversed.]

*Allan R. Brown* for appellants.

*Charles D. Lawrence,* Assistant Attorney General (*Ralph Folks,* special attorney, of counsel), for the United States.

[Oral argument May 13, 1926, by Mr. Brown and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Appellants appealed from the decision of the Board of General Appraisers overruling appellants' two protests, 55645–G and 82287–G.

The record shows that the protest was signed by H. W. Robinson & Co. and also by Suzuki & Co., by their attorneys, also that Suzuki & Co. are the owners and that H. W. Robinson & Co. are customs brokers and are the importers of record.

The merchandise in this case consists of a shipment of sugar bags from Culcutta, India. They were intended for the Cuban market and were covered by a through bill of lading showing their ultimate destination, Cuba, by way of New York.

The bags arrived at New York from Calcutta on the steamship *Elveric,* about October 30, 1922. The testimony shows that, at the time of their arrival at New York, business conditions in Cuba were such that they could not be disposed of. The importers secured what is known as a special general order permit from the New York customs officials whereby the bags, still in the custody of the collector, were placed in a special designated bonded warehouse. The importers insured the bags and paid the warehouse charges.

The special general order permit to transfer contains the following notation:

As contract for storage includes transfer to local conveyances of the warehouse, request is made for approval of such transfer without designation of customhouse licensed carts or lighters.

In accordance with this request the permit to transfer was approved without the designation of the customhouse licensed carts or lighters.

Over a year later, January 26, 1924, the importers, intending to ship the merchandise to Cuba, offered an export entry on the regular customs form.    The collector refused to receive the entry and relied upon section 491 of the Tariff Act of 1922 as authority for such action, holding that the duties thereon must be paid before exportation could be made, the merchandise having been in the custody of the collector for more than one year.    The action of the collector was taken pursuant to the instructions of the Treasury Department demanding payment of duty before the goods could be exported.

After the collector refused to receive the export entry and held that no exportation could be made without the payment of duties, the importers made a consumption entry, which was stated to be under duress, and made in order to obtain possession of the merchandise. The collector refused to accept the consumption entry without crossing off the duress notation.    Importers thereupon paid duties, secured a certificate of continuous customs custody, and offered a draw-back entry, which was also refused by the collector.    The goods were then exported to Cuba.

Appellants' brief states that after liquidation of the consumption entry the importers filed protest claiming that the bags in question were not imported merchandise within the meaning of the tariff and that the entry was made under duress to obtain possession of the merchandise on account of the collector's previous refusal to accept the export entry.    This protest is not before us, nor was it considered in the argument in this case.

With respect to the issues involved herein, appellants, in their brief, state:

The protest covered by this appeal was filed against the action of the collector in refusing to accept the export entry and also against the legality of the decision of the Treasury Department in so far as that decision entered into the action of the collector.    The board of general appraisers refused to accept proof of the ruling of the Treasury Department and this has been assigned as error.    A copy of the telegraphed ruling of the Treasury Department, together with the letter of the department confirming the telegram, was incorporated in the protest. The primary question raised by the protest is the validity of the decision of the collector refusing the export entry.    An order holding the decision of the collector to be illegal and sustaining the protest will satisfy the demand of appellant herein.    Of course, incidentally, or at least by implication, the order of the Treasury Department requiring the payment of duty before exportation must be held to be illegal.

The petition for review, in this court, refers to export entry No. 29568, which the collector refused to accept on January 26, 1924, and to entry No. 835656, which was the consumption entry heretofore referred to.    The petition for review furthermore lists, under Schedule A, protest No. 82287–G/14912.

The board, however, in its decision, says:

Protest 55645–G, which is now before us for decision, is against the action of the collector in refusing to permit exportation without payment of duty. Protest 82287–G is directed against the legality of the decision of the Treasury Department, which entered into the collector's decision, authorizing his action, and prays that the duties so exacted should be refunded.

and concludes by saying:

For the reasons set forth above we overrule the protests.

The decision of the board is headed "Protests 55645–G and 82287–G against the decision of the collector of customs at the port of New York."

The only protest contained in the record here is headed "Protest 82287–G/14912," in which the following statement is found:

Particular exception is taken to your decision on January 26, 1924, refusing to accept entry for exportation No. 29588 and refusing to issue permit for export. Exception is also taken to the legality of the decision of the Treasury Department under date of February 1, 1924, wherein your action is authorized or approved. Copy of the telegram and letter of the Treasury Department complained of is attached hereto and made a part hereof.

While the board found that the action of the collector refusing to admit exportation was covered by protest No. 55645–G and the action of the Treasury Department was covered by protest No. 82287–G and action upon both protests, we think the protest found in the record (82287–G/14912), purported to cover both questions. The action of the collector may have been based upon the instructions of the Treasury Department, but the protest must necessarily be confined to the action of the collector. We can not see how the Treasury Department's instructions can have any possible bearing upon what is conceded to be the sole issue in this case, to wit, Did the collector properly refuse to accept the export entry tendered by the importers?

The decision in this case involves the construction of sections 491 and 493 of the Tariff Act of 1922, which read as follows:

Sec. 491. *Unclaimed goods.*—If any merchandise of which possession has been taken by the collector shall remain in bonded warehouse or public store for one year without entry thereof having been made and the duties and charges thereon paid, such merchandise shall be appraised by the appraiser of merchandise and sold by the collector at public auction as abandoned to the Government, under such regulations as the Secretary of the Treasury shall prescribe. All gunpowder and other explosive substances and merchandise liable to depreciation in value by damage, leakage, or other cause to such extent that the proceeds of sale thereof may be insufficient to pay the duties, storage, and other charges, if permitted to remain in public store or bonded warehouse for a period of one year, may be sold forthwith, under such regulations as the Secretary of the Treasury may prescribe.

Sec. 493. *Proceeds of sale.*—The surplus of the proceeds of sales under section 491 of this act, after the payment of storage charges, expenses, duties, and the

satisfaction of any lien for freight, charges, or contribution in general average, shall be deposited by the collector in the Treasury of the United States, if claim therefor shall not be filed with the collector within 10 days from the date of sale, and the sale of such merchandise shall exonerate the master of any vessel in which the merchandise was imported from all claims of the owner thereof, who shall nevertheless, on due proof of his interest, be entitled to receive from the Treasury the amount of any surplus of the proceeds of sale.

It is the contention of the importers that section 491, *supra*, is intended to apply only to goods which are in fact unclaimed and not applicable to goods which have been claimed and the ownership of which is known and the storage charges for which are paid by the owner. The importers lay particular stress upon the heading of the section, "Unclaimed goods," and it is urged that, under decisions of this and other courts, unless the legislative intent is shown to be otherwise, the heading "Unclaimed merchandise" controls, and the section would therefore only be concerned with goods that were in fact unclaimed. They cite *Crimmins & Pierce et al.* v. *United States*, 6 Ct. Cust. Appls. 137; *United States* v. *American Shipping Co.*, 13 Ct. Cust. Appls. 346, T. D. 41254.

It is furthermore argued by appellants that even if the merchandise at bar is unclaimed merchandise within the meaning of section 491 the right of the collector to sell the same had not accrued, because the charges had been paid, and that his right to sell could only accrue when four things happened: (1) Merchandise remained in bond over one year; (2) no entry is made; (3) if duties are unpaid; and (4) if the charges are not paid.

The predecessors of section 491, *supra*, R. S. 2965 and 2973, which were repealed by the Tariff Act of 1922, read as follows:

Sec. 2965. Unclaimed merchandise required by existing laws to be taken possession of by collectors of the customs may be stored in any public warehouse owned or leased by the United States or in any private bonded warehouse authorized by this title, and all charges for storage, labor, and other expenses accruing on any such merchandise, not to exceed in any case the regular rates for such objects at the port in question, must be .paid before delivery of the goods on due entry thereof by the claimant or owner; or if sold as unclaimed goods to realize the import duties, the charges shall be paid by the collector out of the proceeds of the sale thereof before paying such proceeds into the Treasury as required by existing laws.

Sec. 2973. If any merchandise shall remain in public store beyond one year, without payment of the duties and charges thereon, except as hereinbefore provided, then such merchandise shall be appraised by the appraisers, if there be any at such port, and if none, then by two merchants to be designated and sworn by the collector for that purpose, and sold by the collector at public auction, on due public notice thereof being first given, in the manner and for the time to be prescribed by a general regulation of the Treasury Department At such public sale, distinct printed catalogues descriptive of such merchandise, with the appraised value affixed thereto, shall be distributed among the persons present at such sale. A reasonable opportunity shall be given before such sale, to persons desirous of purchasing, to inspect the quality of such merchandise.

The proceeds of such sales, after deducting the usual rate of storage at the port in question, with all other charges and expenses, including duties, shall be paid over to the owner, importer, consignee, or agent, and proper receipts taken for the same.

The predecessor of section 550 of the Tariff Act of 1922 (Abandonment of warehouse goods), was R. S. 2971, which contained the following provision:

Any goods remaining in public store or bonded warehouse beyond three years shall be regarded as abandoned to the Government, and sold under such regulations as the Secretary of the Treasury may prescribe, and the proceeds paid into the Treasury.

Article 808 of the Customs Regulations of 1892 reads as follows:

ART. 808. At any time within one year after importation merchandise so taken possession of may be claimed by the consignee and due entry made thereof. But if not so entered within one year, it must be sold at public auction at the next ensuing regular sale, provided, that at any time previous to being listed for sale it may be entered for consumption only, and withdrawn upon payment of duty and expenses.

Richard Olney, Attorney General, in a decision dated January 17, 1895, T. D. 15788, held that the requirement of the regulation was illegal. It will be noted that this wording is repeated in section 569 of the tariff act of 1892. The Attorney General held that section 2971 applied not only to merchandise entered for warehouse, but also to merchandise deposited in store as unclaimed merchandise under the provisions of section 2965 of the Revised Statutes, and that, until the three-year period had expired, there was no limitation upon the entry of such merchandise for warehouse or consumption so long as it remained in the custody of the Government, that is so long as it remained unsold. See also opinion of Attorney General Gregory, T. D. 37654.

The difference between R. S. 2971 (its successor 559) and R. S. 2965 (its successor 491) is that in the former the law requires that at the end of the three-year period the merchandise shall be regarded as abandoned to the Government, while in the latter there is no such provision. We do, however, find this phrase in section 491: "and sold by the collector at public auction as abandoned to the Government." It seems to have been settled that, even after the three-year period had elapsed and the goods were regarded as abandoned to the Government, the importers might claim them and enter them for warehouse or consumption so long as they had not been actually sold. It seems that this has been the accepted interpretation of the law for many years. We know of no statute or decision to the contrary. We conclude, therefore, that if the importer can exercise his rights over the goods after they have been in warehouse for more than three years, and are, by statute, regarded as abandoned to the Government, he would not lose his rights to export them without the payment of

duties, where he had made no entry of them and where the goods had not been sold and had not remained in the warehouse for three years. It is difficult for us to believe that by section 491 Congress intended to cover goods the owner of which was known and who asserted such ownership and made expenditure for their keeping. In this view we are confirmed by a portion of the wording of section 559 as follows:

and the proceeds of sale paid into the Treasury, as in the case of unclaimed merchandise covered by section 493 of this act.  *  *  *

Section 493 of the act of 1922 is concerning the proceeds of sale under section 491.

We are inclined to agree with the contention of importers, that the merchandise is not within the meaning or understanding of section 491, since it seems unavoidable to conclude that this section was only intended to cover "unclaimed merchandise," which this merchandise is admitted not to be. What could Congress have meant by heading the section " *Unclaimed merchandise*" other than the interpretation for which the importers contend?

In *Crimmins & Pierce* v. *United States, supra,* paragraph 651 of the tariff act of 1913 provided for "Wool wastes: All noils, top waste, card waste, etc." The question in the case was whether wool noils were wastes. The court held that they were wastes, chiefly because the paragraph opened with "Wool wastes" and then said "All noils,  *  *  *." The court then said:

It seems to us that the enumerations are all predicated on the words "wool waste," and that all the enumerations within the paragraph in order to be included therewithin must be deemed first, wool, and, second, wastes.

The case of *Hormann, Schutte & Co.* v. *United States,* 153 Fed. 868, was cited by the court.

In *United States* v. *American Shipping Co.,* 13 Ct. Cust. Appls. 346, T. D. 41254, the court construed paragraph 61 of the Tariff Act of 1922, which began with "Perfume materials; ambergris, castoreum, civet, etc." We held, citing the *Crimmins & Pierce,* case, *supra,* that in the absence of anything showing the contrary, the use of the words "perfume materials" was strongly indicative of the legislative intent to include within the paragraph only such articles as were used as perfume materials. Applying the doctrine of this case to the issues at hand, unless there are strong indications to the contrary we must hold that Congress contemplated the provisions of section 491 to apply only to goods which were actually unclaimed.

In the section we find:

If any merchandise of which possession has been taken by the collector shall remain in bonded warehouse or public stores for one year without entry thereof, etc.

We believe it means any "unclaimed merchandise" under customs custody and subject to regulations of the Treasury Department. The proof in this record shows that the use of the special general-order practice has been in existence for at least a half century. It seems that the legality of its existence and functions during all that time remained unquestioned.

No entry having been made of the goods in controversy and having been in customs custody less than three years, we know of no valid reason why the owner of the same should be denied the rights to export them without paying duties.

While the correctness of this conclusion may be argued against with considerable plausibility, an opposite result, in our judgment, would lead to such obvious hardship and resulting unfairness as to be beyond the fair intent of Congress. Here were goods never intended for consumption in the United States, were not entered for warehouse or for any other purpose, as far as the issues in this case were concerned, upon which the collector has demanded the full duty as if they had gone into consumption or as if they had been abandoned to the Government by remaining in bonded warehouse for a period of more than three years.

The collector should have accepted the tendered entry for export without demanding the payment of the duties thereon. It follows that the Board of General Appraisers should have sustained the protest and the judgment of the Board of General Appraisers (now the United States Customs Court) is reversed and remanded for further action not inconsistent with the views expressed herein.

*Reversed* and *remanded.*

HATFIELD, J., concurs in conclusion.